UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ZOLTAN KRISKO,

      Plaintiff,

v.

MARVEL ENTERTAINMENT, LLC, *a Delaware limited liability company*; WARNER CHAPPELL MUSIC, INC., *a Delaware corporation*; THE WALT DISNEY COMPANY, *a Delaware corporation*; FOX CORPORATION, *a Delaware corporation*; BUENA VISTA TELEVISION, LLC, *a California limited liability company*; NBCUNIVERSAL MEDIA, LLC, *a Delaware limited liability company*; AMAZON.COM, INC., *a Delaware corporation*; APPLE INC., *a California corporation*; RONALD AARON WASSERMAN; SHUKI LEVY; and HAIM SABAN,

      Defendants.

No. 19 Civ. 9256 (GHW)

**Oral Argument Requested**

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.    Preliminary Statement........................................................................................1

II.   Statement of Facts.............................................................................................2

    A.   *Linda* and Its Production in Hungary...........................................................2

    B.   Plaintiff's Access Allegations........................................................................3

    C.   Plaintiff's "Experts".......................................................................................5

    D.   This Lawsuit....................................................................................................7

III.  Standard of Review............................................................................................7

IV.   Argument............................................................................................................8

    A.   The SAC Fails to Plausibly Allege Access....................................................8

        1.   The Controlling Legal Standard for Alleging Access ........................8

        2.   The Speculative Allegations of Access in the SAC Fail to
            State a Claim........................................................................................10

            a.   The SAC Does Not Set Forth a Plausible Chain of
                Events Linking the *Linda* Theme Song to
                Defendants ...............................................................................11

            b.   The SAC Does Not Allege Widespread
                Dissemination in a Relevant Location, and in Fact
                Shows a Lack of Dissemination...............................................15

    B.   The SAC Fails to Plausibly Allege Striking Similarity ...............................17

        1.   Plaintiff's "Experts" Fail to Meet the Stringent Standard
            of Striking Similarity Under U.S. Law ..............................................18

        2.   The SAC Does Not Allege Any Striking Similarities in
            Protectable Expression, and in Fact Concedes
            Dissimilarities....................................................................................21

    C.   The SAC's Allegations of Secondary Liability Are Wholly
        Conclusory...................................................................................................24

V.    Conclusion........................................................................................................24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Adams v. Musk,*
No. 15 Civ. 6756 (SLT) (ST), 2016 WL 2757392 (E.D.N.Y. May 11, 2016) .................10, 12

*Adams v. Warner Bros. Pictures,*
289 F. App'x 456 (2d Cir. 2008) ......................................................................................9, 10

*Arista Records LLC v. Lime Grp. LLC,*
784 F. Supp. 2d 398 (S.D.N.Y. 2011)..................................................................................24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................................................................7

*Bunick v. UPN,*
No. 06 Civ. 2833 (RMB) (HMP), 2008 WL 1968305 (S.D.N.Y. Apr. 30, 2008).............18, 19

*Castro v. Cusack,*
No. 15 Civ. 6714 (ENV) (LB), 2019 WL 3385218 (E.D.N.Y. July 26, 2019)...................9, 15

*Chafir v. Carey,*
No. 06 Civ. 3016 (KMW), 2007 WL 2702211 (S.D.N.Y. Sept. 17, 2007) ......................18, 22

*Davis v. Raymond,*
No. 12 Civ. 22578, 2012 WL 12868729 (S.D. Fla. Nov. 30, 2012)...........................11, 12, 23

*DiBartolo v. Abbott Labs.,*
914 F. Supp. 2d 601 (S.D.N.Y. 2012)....................................................................................7

*DiFolco v. MSNBC Cable L.L.C.,*
622 F.3d 104 (2d Cir. 2010)..................................................................................................19

*Dimmie v. Carey,*
88 F. Supp. 2d 142 (S.D.N.Y. 2000)....................................................................................19

*Dress Barn, Inc. v. Klauber Bros., Inc.,*
No. 18 Civ. 8085 (DLC), 2019 WL 1949675 (S.D.N.Y. Apr. 22, 2019), *appeal withdrawn,*
No. 19-1526, 2019 WL 3991054 (2d Cir. July 10, 2019).......................................9, 10, 15, 17

*Eisenberg v. Cty. of Nassau,*
No. 18 Civ. 1742 (JMA) (SIL), 2019 WL 4247283 (E.D.N.Y. Aug. 30, 2019).......................7

*Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.,*
No. 16 Civ. 9987 (PKC), 2019 WL 1382341 (S.D.N.Y. Mar. 27, 2019) ..........................16, 18

ii

*Gilford v. NYS Office of Mental Health*,
   No. 17 Civ. 8033 (JPO), 2019 WL 1113306 (S.D.N.Y. Mar. 11, 2019) ................................13

*Horizon Comics Prods. Inc. v. Marvel Entm't, LLC*,
   No. 16 Civ. 2499 (JPO), 2019 WL 3080847 (S.D.N.Y. July 15, 2019) .................9, 18, 19, 21

*Jorgensen v. Careers BMG Music Publ'g*,
   No. 01 Civ. 0357 (LAP), 2002 WL 1492123 (S.D.N.Y. July 11, 2002) ...............................21

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003) ...................................................................................................8, 9

*Matthew Bender & Co. v. W. Publ'g Co.*,
   158 F.3d 693 (2d Cir. 1998) .....................................................................................................24

*McKain v. Estate of Rhymer*,
   166 F. Supp. 3d 197 (D. Conn. 2015) ...........................................................................9, 10, 15

*Moore v. City of New York*,
   No. 08 Civ. 8879 (PGG), 2010 WL 742981 (S.D.N.Y. Mar. 2, 2010) ....................................14

*Morris v. Wilson*,
   189 F. Supp. 565 (S.D.N.Y. 1960), *aff'd*, 295 F.2d 36 (2d Cir. 1961) .............................14, 18

*Palmieri v. Estefan*,
   No. 91 Civ. 3098 (RO), 1995 WL 331719 (S.D.N.Y. June 5, 1995) .................................13, 16

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010) .......................................................................................................23

*Price v. Fox Entm't Grp., Inc.*,
   499 F. Supp. 2d 382 (S.D.N.Y. 2007) ................................................................18, 20, 22, 23

*Repp v. Webber*,
   132 F.3d 882 (2d Cir. 1997) ..............................................................................................18, 21

*Repp v. Webber*,
   947 F. Supp. 105 (S.D.N.Y. 1996), *aff'd*, 132 F.3d 882 (2d Cir. 1997) ................................23

*Silberstein v. Fox Entm't Grp., Inc.*,
   424 F. Supp. 2d 616 (S.D.N.Y. 2004), *aff'd sub nom. Silberstein v. Does*, 242 F. App'x 720
   (2d Cir. 2007) ...........................................................................................................................10

*Skidmore v. Led Zeppelin*,
   No. 16-56057, 2020 WL 1128808 (9th Cir. Mar. 9, 2020) .....................................................22

*Stora v. Don't Ask Why Outfitters*,
No. 15 Civ. 7106 (RRM) (RML), 2016 WL 10571885 (E.D.N.Y. Dec. 7, 2016), *report and recommendation adopted*, 2017 WL 1034637 (E.D.N.Y. Mar. 17, 2017) ...............................9

*Tisi v. Patrick*,
97 F. Supp. 2d 539 (S.D.N.Y. 2000)....................................................................23

*Triano v. Town of Harrison*,
895 F. Supp. 2d 526 (S.D.N.Y. 2012)..................................................................13

*Turner v. SAMSUNG Telecomms. Am., LLC*,
No. 13 Civ. 00629 (MWF) (VBKx), 2013 WL 12123998 (C.D. Cal. May 2, 2013) ..............16

*Turner v. SAMSUNG Telecomms. Am., LLC*,
No. 13 Civ. 00629 (MWF) (VBKx), 2014 WL 11456606 (C.D. Cal. Aug. 4, 2014)........20, 21

*Vargas v. Transeau*,
514 F. Supp. 2d 439 (S.D.N.Y. 2007), *aff'd sub nom. Vargas v. Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009)..................................................................17, 18, 22

*Wager v. Littell*,
549 F. App'x 32 (2d Cir. 2014) ...............................................................9, 10, 15, 22

*Wager v. Littell*,
No. 12 Civ. 1292 (TPG), 2013 WL 1234951 (S.D.N.Y. Mar. 26, 2013), *aff'd*, 549 F. App'x 32 (2d Cir. 2014)..................................................................9, 22

*Watt v. Butler*,
744 F. Supp. 2d 1315 (N.D. Ga. 2010), *aff'd*, 457 F. App'x 856 (11th Cir. 2012) ................23

OTHER AUTHORITIES

Fed. R. Civ. Proc. 12(b)(6) ...............................................................1, 7, 9

*Linda: A szatír*, IMDb, https://www.imdb.com/title/tt0632635/?ref_=ttep_ep1 (last visited Apr. 14, 2020) ...............................................................14

*Moon Madness [Le secret des sélénites (original title)]: Release Info*, IMDb, https://www.imdb.com/title/tt0184748/releaseinfo?ref_=tt_dt_dt (last visited Apr. 14, 2020) ...............................................................14

3 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 9:38–:58 (2020)....................................................................19

Defendants Marvel Entertainment, LLC ("Marvel"); Warner Chappell Music, Inc. ("Chappell"); The Walt Disney Company ("Disney"); Fox Corporation ("Fox"); Buena Vista Television, LLC ("BVT"); NBCUniversal Media, LLC ("NBCUniversal"); Amazon.com, Inc. ("Amazon"); and Apple Inc. ("Apple"), by their attorneys, Jenner & Block LLP, respectfully submit this Memorandum in support of their motion to dismiss the Second Amended Complaint ("SAC") of Plaintiff Zoltan Krisko, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.      PRELIMINARY STATEMENT

Plaintiff alleges that he is the copyright owner of a musical composition that was performed as the theme song for a television show called *Linda* that was produced and aired in Hungary during the 1980s.  He further alleges that the theme song of the 1990s U.S. television show *X-Men: The Animated Series* ("*X-Men*") and certain subsequent X-Men–related productions infringe his copyright in the composition for the *Linda* theme.

A critical element of any claim of copyright infringement is plausibly alleging that the infringer had access to the copyrighted work that was supposedly copied.  In response to Defendants' pre-motion letters challenging the sufficiency of the access allegations in the amended complaint, Plaintiff essentially conceded that those allegations were legally insufficient and sought leave to amend again.  While leave was granted, the newest pleading fares no better than its predecessors.  Plaintiff still fails to allege any plausible facts that connect Defendants to Plaintiff's work.  Unable to identify a single person who had the necessary demonstrable links to both the *Linda* theme and the alleged composers of the *X-Men* theme, Plaintiff instead attempts to lower the pleading standard and posit connections between those Defendants and a Hungarian company or a person of Hungarian or even part-Hungarian origin.  However, Plaintiff cannot even satisfy that manufactured standard and plainly fails to satisfy his burden to plausibly plead that Defendants had access to the *Linda* theme prior to composing the *X-Men* theme.

Recognizing the speculative and insufficient nature of his access allegations, Plaintiff alternatively argues that the works are "strikingly similar," which would require Plaintiff to demonstrate that the two works could not have been independently created.  But this argument fails because it relies exclusively on cherry-picked and misleading quotations from an "expert opinion" that was expressly rendered under Hungarian law and neither claims that the works are strikingly similar nor purports to apply the stringent standard necessary to reach that conclusion.

Finally, Plaintiff asserts theories of secondary liability in a wholly conclusory manner without any factual support.

## II.    STATEMENT OF FACTS[1]

### A.    *Linda* and Its Production in Hungary

Plaintiff claims to be the heir of Gyorgy Vukan, who composed the soundtrack for a Hungarian television show called *Linda* that "aired" from 1984 to 1991.  SAC ¶¶ 5, 17–18, Doc. 60.  Although the entire series consisted of only 17 episodes (fewer than the number of episodes in a single year of a typical U.S. television show), the SAC contains a series of conclusory assertions intended to make *Linda* sound as if it were a cornerstone of Hungarian popular culture: that *Linda* was "one of the most popular TV series in Hungary" in the 1980s, that *Linda* was "a household name in Hungary," and perhaps most remarkably that "an entire country could identify the series through its iconic soundtrack."  SAC ¶¶ 17–18.

Plaintiff's latest pleading adds the allegation that *Linda* "was sold to and aired in over 40 countries," including unspecified "Eastern and Western European countries," though there is no allegation as to the volume of those "sales" or the frequency, timing, or viewership of those "airings."  SAC ¶ 19.  Plaintiff also asserts that *Linda* "was shown at film festivals and received

---

[1] Defendants accept the factual allegations in the SAC as true for purposes of this motion only.

positive reviews from critics outside of Hungary," although he never identifies the film festivals or their locations.  *Id.*  There is no allegation that *Linda* was ever broadcast or distributed in the United States.

*Linda* aired on Hungarian Television and was produced by MAFILM, a Hungarian film production company.  SAC ¶ 23.  While Plaintiff alleges that MAFILM was an "affiliate" of Pannonia Filmstudio, a Hungarian animation workshop (and an entity central to Plaintiff's fanciful access theory), there are no allegations that *Linda* or its theme music was produced, written, or recorded at Pannonia.[2]  SAC ¶¶ 20, 23.  Indeed, there are no allegations that any employees of Pannonia had anything to do with the series aside from the allegation that one animator employed by Pannonia, Peter Kozma, created some animation for the show's opening credits.  SAC ¶ 23.  Nonetheless, Plaintiff makes the unsupported conclusory assertion that *Linda*'s "animation and music was a high-profile matter at Pannonia" in 1983 and 1984.  *Id.*

Unable to tie Pannonia to the creation or production of the *Linda* theme, Plaintiff is left with unsupported and irrelevant assertions that Pannonia "collaborated" on other unidentified "projects" with MAFILM and Hungarian Television, and that "Hungarian film industry professionals, such as Gyorgy Vukan, were frequent visitors" at Pannonia for unspecified reasons.  SAC ¶¶ 20, 23.

**B.     Plaintiff's Access Allegations**

*X-Men* was an animated television show that aired from 1992 to 1997.  SAC ¶ 31. Defendants Haim Saban, Shuki Levy, and Ronald Wasserman allegedly co-composed or held

---

[2] The absence of links between Pannonia and *Linda* is unsurprising since Pannonia is an animation studio and *Linda* was not an animated series.  *See* SAC ¶¶ 20, 23.

themselves out as composers of the theme song for *X-Men*.[3]  SAC ¶¶ 26–28.  Saban and Levy live in California, where they moved in the mid-1980s—over five years before the launch of the *X-Men* series.  SAC ¶¶ 15–16, 21.  To survive this motion, Plaintiff has the burden to identify specific facts that make it plausible that they had access to Plaintiff's composition before composing the *X-Men* theme.

Bereft of any such specific facts, Plaintiff instead relies on a generic allegation that Saban and Levy "came in contact with Hungarian professionals in the film industry."  SAC ¶ 20.  However, that allegation does not support a plausible claim of access since the SAC does not identify who these "professionals" were, what their connection to *Linda* was, if any, or the circumstances under which they supposedly met Saban and Levy.

The closest that Plaintiff comes to alleging a factual predicate for his allegations of access stems from the fact that Saban and Levy composed the music for a 1984 French animated film, *Le Secret des Selenites* ("*Le Secret*"), directed by Jean Image, a filmmaker of French and Hungarian origin.  SAC ¶ 21.  While Plaintiff alleges on information and belief that Image visited Hungary multiple times and had unspecified ties to unnamed Hungarian professionals, Plaintiff does not allege that Saban or Levy ever met Image.  SAC ¶ 22.

Recognizing his inability to allege any meeting between Defendants and Image, Plaintiff's primary access theory is based on the allegation that a Hungarian premiere of a dubbed version of *Le Secret* was held at Pannonia in 1984.  SAC ¶ 22.  Without a single supporting fact, Plaintiff alleges, on information and belief, that "producers and composers of animated films were typically invited to, and attended, the Hungarian premieres of those films,"

---

[3] There is no allegation that Wasserman had access to the *Linda* theme.  Accordingly, this Memorandum focuses on Plaintiff's allegations of access by Saban and Levy.

and "it would have been customary for Image, Saban, and Levy to have been invited to and attend the Hungarian premiere of Le Secret des Selenites at Pannonia."  SAC ¶ 24.

As an initial matter, these allegations are an improper use of pleading on information and belief (which, in this case, means nothing more than Plaintiff would like to believe that it might have happened) and a manifestly inadequate allegation of industry custom.  Moreover, these allegations underscore that Plaintiff is unable to allege that Saban or Levy ever traveled to Hungary—let alone to attend the local premiere of a previously released film dubbed in a language that they did not understand.  Further, Plaintiff is unable to allege facts that establish that Saban or Levy would have had an opportunity to hear the *Linda* theme even if they had made this hypothetical trip.

Stripped of all the speculation, improper allegations of custom, and irrelevancies, all that remains of Plaintiff's primary access theory is the conclusory allegation that Saban and Levy "were aware of" Pannonia.  SAC ¶ 20.

Indeed, the SAC indirectly acknowledges the substantial obstacles to any claim that Defendants had access to the *Linda* soundtrack.  Plaintiff concedes that the *Linda* theme was "composed behind the Iron Curtain," at a time when that barrier greatly restricted the flow of television shows and other media—a factor exacerbated by the fact that the relevant period was well before the advent of commercial internet service.  SAC ¶ 51.

## C.    Plaintiff's "Experts"

Plaintiff asserts that the *X-Men* theme song infringes the copyright to the *Linda* theme.  In support of this assertion, Plaintiff has retained an American musicologist, Judith Finell, who analyzed the two works and concluded that they are "substantially similar."  SAC ¶ 34 n.5.  In both of his earlier complaints, this alleged substantial similarity was the basis of Plaintiff's claim.  First Am. Compl. ¶ 29 & n.5, Doc. 32; Compl. ¶ 28 & n.5, Doc. 1.

In response to Defendants' initial pre-motion letters challenging the sufficiency of Plaintiff's access claims in the First Amended Complaint, Plaintiff pivoted in the SAC and alleged for the first time that the works are "strikingly similar"; in other words, that the works are so pervasively similar as to preclude any possibility of independent creation. SAC ¶ 34. Since his only American musicologist was apparently unwilling to opine that the works were strikingly similar, Plaintiff now relies entirely on the opinion of musicologists at the Hungarian Council of Copyright Experts (the "Hungarian Opinion") as alleged support for this assertion. *Id.*

However, the Hungarian Opinion does not opine that there is striking similarity under U.S. law. Indeed, the words "striking similarity" never appear in the Hungarian Opinion. *See* Hungarian Opinion, Bart Decl. Ex. 2. Rather, the Hungarian Opinion expressly discloses that the "competence" of the Hungarian Council is limited to the Hungarian Copyright Act and opining on "the interpretation of Hungarian law (primarily the [Hungarian] Copyright Act) and the related Hungarian legal practice." *Id.* at 2.

Substantively, the language of the Hungarian Opinion falls far short of satisfying the stringent standard required to demonstrate striking similarity. The Hungarian Opinion speculates that the songs "most likely preclude the possibility" of independent creation, Levy "may" have been acquainted with Vukan's composition, Levy "may" have heard Vukan's music, and "the opposite can't be excluded either"—thereby conceding the possibility of the independent creation of the two works at issue.[4] *Id.* at 4. Indeed, Plaintiff fully understood the limits of the Hungarian Opinion because in his first two complaints he conceded that the Hungarian musicologists concluded that the works were only "substantially similar," not strikingly similar. First Am. Compl. ¶ 29 n.5; Compl. ¶ 28 n.5.

---

[4] The Hungarian Opinion refers to Shuki Levy as "S.L." and Gyorgy Vukan as "Gy. V."

### D.     This Lawsuit

After applying for a U.S. copyright registration for the composition of the *Linda* theme song in 2017, Plaintiff filed his Complaint *pro se* on October 7, 2019—27 years after *X-Men* first aired.  SAC ¶ 53 & Ex. 1; *see also* Compl.  Thereafter, with the aid of counsel, Plaintiff amended his Complaint.  *See* First Am. Compl.  After receiving Defendants' pre-motion letters seeking leave to move to dismiss, Plaintiff sought and received leave to amend again and now asserts one claim for copyright infringement, asserting both direct infringement as well as two theories of secondary infringement.  SAC ¶¶ 54–60.  Plaintiff also brings a claim for injunctive relief.  SAC ¶ 61.  Defendants now move to dismiss the SAC for failure to state a claim.

## III.    <u>STANDARD OF REVIEW</u>

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this standard, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Though all reasonable inferences are drawn in the plaintiff's favor on a motion to dismiss, "'conclusory' statements and mere speculation are inadequate" to support a claim.  *Eisenberg v. Cty. of Nassau*, No. 18 Civ. 1742 (JMA) (SIL), 2019 WL 4247283, at *2 (E.D.N.Y. Aug. 30, 2019) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)).  Further, the Court need not accept as true "conclusions of law or unwarranted deductions of fact."  *DiBartolo v. Abbott Labs.*, 914 F. Supp. 2d 601, 610 (S.D.N.Y. 2012) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994)).

IV.    **ARGUMENT**

Unable to allege any facts that would support the proposition that Saban or Levy obtained access to the *Linda* theme song, Plaintiff instead presents a series of speculative and disjointed allegations that seem to be an attempt to connect Saban and Levy to Hungarian individuals or entities.  While establishing a connection between Saban and Levy and the Hungarian individuals and entities described in the SAC would be insufficient to demonstrate access to the *Linda* theme song, Plaintiff fails to even establish such a connection.

Unable to allege facts that support his access theory, Plaintiff alleges "striking similarity" between the *Linda* theme and the *X-Men* theme even though neither his American musicologist nor an opinion rendered by Hungarian musicologists under Hungarian law supports such a claim. Finally, Plaintiff's allegations of secondary liability are conclusory and insufficient.

A.    **The SAC Fails to Plausibly Allege Access**

1.    **The Controlling Legal Standard for Alleging Access**

To state a claim for copyright infringement, the plaintiff must plausibly allege: "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003).  To demonstrate "unauthorized copying," a plaintiff must show that (1) his work was "actually copied," and (2) the portion copied amounts to an "improper or unlawful appropriation."  *Id.* (quoting *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).  A plaintiff may establish actual copying circumstantially by showing that "the person who composed the defendant's work had access to the copyrighted material," and that "there are similarities between the two works that are 'probative of copying.'"  *Id.* (citations omitted).  Solely for purposes of this motion, Defendants challenge only the "access" element of Plaintiff's claim (and the allegations of

striking similarity which, in proper circumstances, may be used as an alternative to demonstrating access).[5]

To plead access, a plaintiff must plausibly allege that the infringer had a "'reasonable possibility' . . . of hearing the prior work." *Jorgensen v. Epic/Sony*, 351 F.3d at 51 (quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988)). To satisfy that standard, the plaintiff must allege "'significant, affirmative and probative' evidence to support a claim of access." *Wager v. Littell*, No. 12 Civ. 1292 (TPG), 2013 WL 1234951, at *3 (S.D.N.Y. Mar. 26, 2013), *aff'd*, 549 F. App'x 32 (2d Cir. 2014); *accord McKain v. Estate of Rhymer*, 166 F. Supp. 3d 197, 201 (D. Conn. 2015). The allegations must rise above a "bare possibility" and cannot be based on mere "speculation or conjecture." *Jorgensen v. Epic/Sony*, 351 F.3d at 51 (quoting *Gaste*, 863 F.2d at 1066).

To establish access, a plaintiff must show either "(1) 'a particular chain of events' or a 'link' from his work to the creators of the allegedly infringing work, or (2) that plaintiff's work was 'widely disseminated.'" *Horizon Comics Prods. Inc. v. Marvel Entm't, LLC*, No. 16 Civ. 2499 (JPO), 2019 WL 3080847, at *3 (S.D.N.Y. July 15, 2019) (quoting *Webb v. Stallone*, 910 F. Supp. 2d 681, 686 (S.D.N.Y. 2012), *aff'd on other grounds*, 555 F. App'x 31 (2d Cir. 2014)). Courts routinely dismiss complaints under Rule 12(b)(6) when the plaintiff fails to plausibly allege facts supporting either theory of access.[6]

---

[5] This motion is without prejudice to any other claims and defenses that Defendants may assert in this litigation if it should continue, including but not limited to the positions that Plaintiff lacks ownership of a valid copyright, the *X-Men* theme is not substantially similar to any protectable aspects of the *Linda* theme, the *X-Men* theme was independently created, and the statute of limitations has expired.

[6] *See Wager v. Littell*, 549 F. App'x 32, 33 (2d Cir. 2014); *Adams v. Warner Bros. Pictures*, 289 F. App'x 456, 457 (2d Cir. 2008); *Castro v. Cusack*, No. 15 Civ. 6714 (ENV) (LB), 2019 WL 3385218, at *6–7 (E.D.N.Y. July 26, 2019); *Dress Barn, Inc. v. Klauber Bros., Inc.*, No. 18 Civ. 8085 (DLC), 2019 WL 1949675, at *5 (S.D.N.Y. Apr. 22, 2019), *appeal withdrawn*, No. 19-1526, 2019 WL 3991054 (2d Cir. July 10, 2019); *Stora v. Don't Ask Why Outfitters*, No. 15 Civ. 7106 (RRM) (RML), 2016 WL 10571885,

As the Second Circuit has repeatedly affirmed, an alleged "chain of events" based on speculation and conjecture does not identify a plausible link between the copyrighted work and the infringer.  *Wager v. Littell*, 549 F. App'x 32, 33–34 (2d Cir. 2014); *Adams v. Warner Bros. Pictures*, 289 F. App'x 456, 458 n.2 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570).

To establish "widespread dissemination," the plaintiff must show that the copyrighted work "has had considerable commercial success or is readily available on the market." *Silberstein v. Fox Entm't Grp., Inc.*, 424 F. Supp. 2d 616, 627 (S.D.N.Y. 2004), *aff'd sub nom. Silberstein v. Does*, 242 F. App'x 720 (2d Cir. 2007).  Additionally, the plaintiff must allege facts demonstrating sufficiently extensive dissemination in a place and time where the alleged infringer could have accessed the work.  *Dress Barn, Inc. v. Klauber Bros., Inc.*, No. 18 Civ. 8085 (DLC), 2019 WL 1949675, at *5 (S.D.N.Y. Apr. 22, 2019), *appeal withdrawn*, No. 19-1526, 2019 WL 3991054 (2d Cir. July 10, 2019).

### 2.    The Speculative Allegations of Access in the SAC Fail to State a Claim

To state a valid claim, Plaintiff must allege facts that would demonstrate that Defendants obtained access to the theme song of the 1980s Hungarian television show *Linda*.  Recognizing that he cannot allege a single fact supporting that critical connection, Plaintiff instead attempts to demonstrate links between two of the individual Defendants (Saban and Levy) and either Hungarian nationals who work in the film industry or the Pannonia Filmstudio located in that country.  Neither connection, even if true, satisfies Plaintiff's pleading burden.  It is not sufficient to tie Defendants to something "Hungarian" (although the SAC fails to even

---

at *5 (E.D.N.Y. Dec. 7, 2016), *report and recommendation adopted*, 2017 WL 1034637 (E.D.N.Y. Mar. 17, 2017); *Adams v. Musk*, No. 15 Civ. 6756 (SLT) (ST), 2016 WL 2757392, at *4 (E.D.N.Y. May 11, 2016); *McKain v. Estate of Rhymer*, 166 F. Supp. 3d 197, 201 (D. Conn. 2015).

accomplish that); to avoid dismissal, he must specifically allege facts showing that Saban and Levy had access to the *Linda* theme.

           **a.**      **The SAC Does Not Set Forth a Plausible Chain of Events Linking the *Linda* Theme Song to Defendants**

Plaintiff's access allegations begin with the general and unsupported claim that Saban and Levy came in contact with unidentified "Hungarian professionals in the film industry."  SAC ¶ 20.  However, this allegation is legally meaningless as it does not allege who the "professionals" were; when, where, or how they met Saban or Levy; or any connection to *Linda*. *See Davis v. Raymond*, No. 12 Civ. 22578, 2012 WL 12868729, at *3 (S.D. Fla. Nov. 30, 2012) (dismissing complaint where plaintiff alleged "no details whatsoever" concerning an unidentified songwriter who supposedly delivered the work to defendants, such as "when, where, and how the delivery occurred, or the nature of the[ir] relationship, if any").

Plaintiff does identify one individual by name—Jean Image, a filmmaker who happened to be of French and Hungarian origin.  SAC ¶ 21.  Plaintiff places great emphasis on Image in the SAC and specifically on the fact that he directed the French film *Le Secret*, for which Saban and Levy composed music.  *Id.*  Yet for all of the focus on Image, Plaintiff is unable to allege that Saban or Levy ever met Image.  Even if Plaintiff could plausibly allege this fact, Plaintiff cannot allege that Image was involved in any way with the production of *Linda* or its music, nor can Plaintiff allege any factual foundation for the fanciful suggestion that Image would have played or otherwise introduced the *Linda* theme to Saban or Levy even if they had ever met (which again is never alleged).

Plaintiff further alleges that *Le Secret* was dubbed in Hungarian by unnamed "France-based and Hungary-based professionals," but Plaintiff fails to connect that dubbing process to

Saban or Levy.  SAC ¶ 22.  And there is no allegation that dubbing *Le Secret* into Hungarian had anything to do with the *Linda* theme.

Apart from Plaintiff's focus on Image as a potential nexus for access to the *Linda* theme, Plaintiff fixates on Pannonia Filmstudio, an animation workshop in Hungary.  SAC ¶ 20. However, Pannonia had no more than a tenuous connection to *Linda* and no connection whatsoever to Saban or Levy.  Perhaps the most striking aspect of Plaintiff's access allegations is his inability to allege that Saban or Levy were ever at Pannonia (or even in Hungary, for that matter).  Accordingly, Plaintiff is reduced to making irrelevant general allegations that are not linked to the Defendants at all.  First, he alleges that Vukan was a "frequent visitor[]" at Pannonia for unspecified reasons.  *Id.*  Second, Plaintiff alleges baldly that *Linda* was a "high-profile matter" at Pannonia in 1983 and 1984.  SAC ¶ 23.  However, there is no allegation that *Linda* or its theme was composed, recorded, produced, or exhibited at Pannonia—nor is there any logical basis to infer such a nexus as Pannonia is an animation studio and *Linda* was not an animated series.  Third, Plaintiff alleges that Pannonia collaborated on unidentified "projects" with the companies that produced and broadcast *Linda*, but does not allege that *Linda* was such a project.  *Id.*  Finally, Plaintiff alleges that one animator who worked at Pannonia, Peter Kozma, created the animation for the opening credits of *Linda*.  *Id.*  However, the SAC does not allege that Kozma's limited work on *Linda* occurred at Pannonia or that Kozma ever met Saban or Levy.  Thus, these vague allegations do not create a relevant connection between Pannonia and *Linda*, nor any material connection to the *Linda* theme.  *See Adams v. Musk*, No. 15 Civ. 6756 (SLT) (ST), 2016 WL 2757392, at *4 (E.D.N.Y. May 11, 2016) (dismissing complaint because plaintiff failed to allege "even a 'reasonable possibility of access'" where he alleged that "perhaps" defendants saw a film containing the allegedly infringed work).

More importantly, as noted above, no discussion of any alleged connection between *Linda* and Pannonia is of any relevance to the issue of access unless Plaintiff can plausibly link Defendants to Pannonia in a legally significant way.  Plaintiff's attempts to do so are patently inadequate.  First, Plaintiff alleges that Saban and Levy were "aware of" Pannonia.  SAC ¶ 20. Even if this allegation were true (and no facts are alleged to support this conclusory statement), their alleged general awareness of the existence of an animation studio—which Plaintiff acknowledges did not produce *Linda*—is not a valid link in a plausible chain of events affording access to the relevant music.  *See Palmieri v. Estefan*, No. 91 Civ. 3098 (RO), 1995 WL 331719, at *1 (S.D.N.Y. June 5, 1995) (holding that "a mere allegation that someone known to the defendant possessed the work in question" is insufficient to show access).

Bereft of any allegations that Saban or Levy were ever at Pannonia (or in Hungary), the core of Plaintiff's access claim is his assertion that, "on information and belief, producers and composers of animated films were typically invited to, and attended, the Hungarian premieres of those films," and "[a]s such, it would have been customary for Image, Saban, and Levy to have been invited to and attend" the Hungarian premiere at Pannonia of a dubbed version of the French film that Saban and Levy scored for Image, *Le Secret*.  SAC ¶¶ 22, 24.

As an initial matter, presenting this allegation as being based "on information and belief" is improper because Plaintiff alleges no facts providing a basis for his belief in the existence of such an alleged industry custom, and such a custom is not peculiarly within Defendants' knowledge.  *Gilford v. NYS Office of Mental Health*, No. 17 Civ. 8033 (JPO), 2019 WL 1113306, at *5 (S.D.N.Y. Mar. 11, 2019).  A mere allegation of a custom is "insufficient to demonstrate the existence of such a custom unless supported by factual details."  *Triano v. Town*

13

*of Harrison*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012); *see also Moore v. City of New York*, No. 08 Civ. 8879 (PGG), 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010).

Furthermore, even if there were a custom of inviting composers to Hungarian premieres, Plaintiff offers no basis for believing that the responses of individual composers to such an invitation would follow an alleged industry norm instead of being the result of the schedule and interest of the relevant composer. Nor is there any reason to believe that the responses of foreign composers to such an alleged invitation would follow the same alleged custom as the responses of local Hungarian composers. While it might be plausible that local Hungarian composers might sometimes attend world premieres of Hungarian animated features produced at Pannonia, Plaintiff alleges no facts supporting the notion that Saban or Levy—who composed music for a *French* film that had its world premiere outside of Hungary—would have traveled to Hungary during communist rule for a local premiere of a version of the film dubbed in a language they are not alleged to understand. Indeed, such a notion is inherently implausible. *See Morris v. Wilson*, 189 F. Supp. 565, 566–67 (S.D.N.Y. 1960) (rejecting plaintiff's "implausible" access theory that playwright followed a "custom" of spending time at the studio where his play was being rehearsed), *aff'd*, 295 F.2d 36 (2d Cir. 1961).

Finally, even if Plaintiff could link Saban and Levy to the *Le Secret* premiere (which he plainly cannot do), Plaintiff would still need to plausibly link the premiere to *Linda*. The SAC contains no allegations that *Linda* was exhibited at or had any connection to the *Le Secret* premiere. Indeed, Plaintiff undoubtedly knows but does not advise the Court that not a single episode of *Linda* had been broadcast by the time of the *Le Secret* premiere in 1984.[7] Plaintiff

---

[7] *Le Secret* was released in Hungary on April 19, 1984. *Moon Madness [Le secret des sélénites (original title)]: Release Info*, IMDb, https://www.imdb.com/title/tt0184748/releaseinfo?ref_=tt_dt_dt (last visited Apr. 14, 2020). The first episode of *Linda* was broadcast months later on November 2, 1984. *Linda: A szatír*, IMDb, https://www.imdb.com/title/tt0632635/?ref_=ttep_ep1 (last visited Apr. 14, 2020); *accord*

also does not allege that anyone connected to *Linda* attended the *Le Secret* premiere and could have crossed paths with Saban or Levy had they also attended (which they did not).  The lack of "contacts or connections" between persons possessing Plaintiff's work and Defendants is fatal to Plaintiff's claim.  *Wager v. Littell*, 549 F. App'x 32, 33 (2d Cir. 2014); *see also Castro v. Cusack*, No. 15 Civ. 6714 (ENV) (LB), 2019 WL 3385218, at *7 (E.D.N.Y. July 26, 2019).

Because the SAC "fails to establish a particular link or chain of events" from the *Linda* theme to Defendants, Plaintiff's allegations of access are legally insufficient.  *McKain v. Estate of Rhymer*, 166 F. Supp. 3d 197, 201 (D. Conn. 2015); *see also Wager*, 549 F. App'x at 33.

### b.     The SAC Does Not Allege Widespread Dissemination in a Relevant Location, and in Fact Shows a Lack of Dissemination

The allegations in the SAC about the alleged widespread dissemination of *Linda* in Hungary are also insufficient given Plaintiff's inability to plausibly allege that Saban or Levy were ever in Hungary, as described above.  But even if they did make the fanciful trip to the Hungarian premiere of the French film *Le Secret*, Plaintiff cannot allege that there was widespread dissemination of *Linda* in Hungary at the time.  Indeed, the first broadcast of the first episode of *Linda* was still over a half-year away.  As such, the vague and unsupported allegations in the SAC that *Linda* was "popular" at unspecified times are not sufficient to allege access through widespread dissemination.  SAC ¶¶ 17–18; *see Dress Barn, Inc. v. Klauber Bros., Inc.*, No. 18 Civ. 8085 (DLC), 2019 WL 1949675, at *5 (S.D.N.Y. Apr. 22, 2019) (requiring facts demonstrating sufficient quantity of distribution in a relevant time and location).

---

SAC Ex. 1 (listing date of first publication of *Linda* soundtrack as November 2, 1984).  Plaintiff attempts to obfuscate these dates by alleging only that the *Le Secret* premiere occurred in 1984 without disclosing that it was in April of that year.  SAC ¶ 22.

Allegations of exploitation outside of Hungary fare no better.  While Plaintiff alleges that *Linda* "was sold to and aired in over 40 countries," including unspecified "Eastern and Western European countries," he does not identify any specific European countries and fails to provide any details whatsoever on the timing or level of distribution in any of these countries.  SAC ¶ 19.  Thus, he does not provide a valid basis for a claim of widespread dissemination.  *See Turner v. SAMSUNG Telecomms. Am., LLC*, No. 13 Civ. 00629 (MWF) (VBKx), 2013 WL 12123998, at *2 (C.D. Cal. May 2, 2013) (requiring "the number of times [the work] was played or downloaded from the website(s)" or other specific allegations to support widespread dissemination); *Palmieri v. Estefan*, No. 91 Civ. 3098 (RO), 1995 WL 331719, at *1 (S.D.N.Y. June 5, 1995).  Similarly, the allegation that *Linda* was shown at unidentified "film festivals" in unnamed countries outside Hungary is plainly insufficient.  SAC ¶ 19.

Even if there were widespread dissemination in some international markets, Plaintiff would need to show that such dissemination occurred at a time when Saban or Levy were present in those countries, which Plaintiff entirely fails to do.  Plaintiff does not allege any facts supporting the notion that *Linda* was readily available in Japan during Saban's alleged trip there in 1985, nor does Plaintiff allege that *Linda* was ever available in France—and he certainly cannot allege that it was available during the time when Saban and Levy allegedly resided in Paris in the early 1980s because the first episode of *Linda* did not air anywhere until November 1984.  SAC ¶¶ 17, 21, 25 & Ex. 1.  Significantly, there is no allegation of any dissemination at all in the United States, where Saban and Levy allegedly moved in the mid-1980s and currently reside.  SAC ¶¶ 15–16, 21; *see Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*, No. 16 Civ. 9987 (PKC), 2019 WL 1382341, at *5 (S.D.N.Y. Mar. 27, 2019) (rejecting theory of widespread dissemination where the work was not distributed in the countries where the alleged

infringers worked).  Accordingly, Plaintiff fails to plausibly allege widespread dissemination at any time in any location where Saban and Levy were ever present.  *See Dress Barn*, 2019 WL 1949675, at *5.

In fact, the SAC underscores the implausibility of the assertions of widespread dissemination, because the *Linda* theme was composed in 1983 and the *X-Men* theme was composed in 1992—well before the advent of commercial internet service.  SAC ¶¶ 18, 31, 51. Accordingly, there was no possibility for unlicensed dissemination over the internet at the time.

### B.  The SAC Fails to Plausibly Allege Striking Similarity

In his first two complaints, Plaintiff never mentioned the words "striking similarity." Neither did the American musicologist whom he retained for this matter and whom Plaintiff continues to cite for the proposition that the songs are "substantially similar."[8]  SAC ¶ 34 n.5.  It was only after receiving Defendants' initial pre-motion letters exposing the lack of access that Plaintiff pivoted and claimed striking similarity as an alternative argument, relying exclusively on misleading quotations from the Hungarian Opinion.

However, if one reviews the entirety of the Hungarian Opinion, which is incorporated by reference in the SAC, it is clear that the Hungarian Opinion does not meet the stringent standard for establishing striking similarity and in fact acknowledges the possibility of independent creation.  Indeed, the Hungarian Opinion never mentions the phrase "striking similarity" and was explicitly rendered solely under Hungarian law.  Finally, although the Court need not reach the issue since Plaintiff's own experts did not conclude that the works are strikingly similar, the SAC

---

[8] Striking similarity requires a greater showing than substantial similarity.  *Vargas v. Transeau*, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007), *aff'd sub nom. Vargas v. Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009).

itself fails to adequately articulate any striking similarities in protectable expression and in fact concedes dissimilarities.

### 1.    Plaintiff's "Experts" Fail to Meet the Stringent Standard of Striking Similarity Under U.S. Law

As an alternative to demonstrating access, a plaintiff may show that "the two works are so strikingly similar as to preclude the possibility of independent creation." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995)). To satisfy that standard, "[t]he works 'must be so *identical* as to preclude any reasonable possibility of independent creation.'" *Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*, No. 16 Civ. 9987 (PKC), 2019 WL 1382341, at *8 (S.D.N.Y. Mar. 27, 2019) (citation omitted). The "similarities between [the works]" must be "so extensive and striking" that "copying is the *only realistic basis for the similarities* at hand." *Price v. Fox Entm't Grp., Inc.*, 499 F. Supp. 2d 382, 386 (S.D.N.Y. 2007) (citations omitted); *see also Morris v. Wilson*, 189 F. Supp. 565, 567 (S.D.N.Y. 1960) (requiring "such striking and extensive similarities" that defendant's work "could not have been written except by copying"), *aff'd*, 295 F.2d 36 (2d Cir. 1961).

Striking similarity is a "stringent" standard, which a purported expert must "scrupulously" meet without equivocation by showing "*no* possibility of independent creation." *Vargas v. Transeau*, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007) (citations omitted), *aff'd sub nom. Vargas v. Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009).  An expert's qualified or equivocating conclusion that independent creation is "highly improbable," *Chafir v. Carey*, No. 06 Civ. 3016 (KMW), 2007 WL 2702211, at *4 (S.D.N.Y. Sept. 17, 2007), or even "approaching impossible" is not enough to rule out the possibility of independent creation and thus does not support a claim of striking similarity.  *Horizon Comics Prods. Inc. v. Marvel Entm't, LLC*, No. 16 Civ. 2499 (JPO), 2019 WL 3080847, at *6 (S.D.N.Y. July 15, 2019); *see also Bunick v. UPN*,

No. 06 Civ. 2833 (RMB) (HMP), 2008 WL 1968305, at *6 (S.D.N.Y. Apr. 30, 2008); *Dimmie v. Carey*, 88 F. Supp. 2d 142, 150 (S.D.N.Y. 2000).[9]

The Hungarian Opinion does not unequivocally "preclude the possibility of independent creation." *Horizon Comics*, 2019 WL 3080847, at *6 (citation omitted).  Rather, the Hungarian Opinion states that the songs "most likely preclude the possibility" of independent creation, Levy "may" have been acquainted with Vukan's composition, Levy "may" have heard Vukan's music, and "the opposite can't be excluded either."  Hungarian Opinion 4, Bart Decl. Ex. 2.[10]  Such equivocations are fatal to any claim that the Hungarian Opinion satisfies the stringent standard of striking similarity, as they acknowledge the possibility that Levy's work was the product of independent creation rather than copying.  *See Bunick*, 2008 WL 1968305, at *6; *Dimmie*, 88 F. Supp. 2d at 150.

While Plaintiff presents a quotation from the Hungarian Opinion claiming that "it is hardly possible for one work to have been created without knowledge of the other," SAC ¶ 34, that is not an accurate translation of the quote,[11] and, more importantly, the rest of the Hungarian Opinion makes clear that it does not rule out the possibility of independent creation, *see* Hungarian Opinion 4; *see also Horizon Comics*, 2019 WL 3080847, at *6 (no striking similarity

---

[9] It is unsurprising that courts apply a strict test and find striking similarity only when it is truly warranted, as some commentators have severely criticized the doctrine and called for cabining or even abandoning it.  *See* 3 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 9:38–:58 (2020) ("[Striking similarity] is a doctrine that should have been strangled at birth.").

[10] The Court may consider the full translated text of the Hungarian Opinion because it is "incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

[11] This statement is properly translated as "it [is] very difficult to presume that one work would have been created without the knowledge of the other."  Hungarian Opinion 3.  Under either translation, this phrase considered in the context of the rest of the Hungarian Opinion does not purport to preclude the possibility of independent creation.

where expert concluded that independent creation was "approaching impossible" and other parts of his opinion were "more equivocating").

Plaintiff's statements that the "'identity' of the two works 'is beyond doubt'" and that the *Linda* theme "can be fully identified from" the *X-Men* theme do not satisfy the rigid standard for striking similarity.  SAC ¶ 34.  As stated in *Turner v. SAMSUNG Telecommunications America, LLC*, "striking similarity is not established by mere identity," particularly where the expert does not "rule out the possibility of independent creation" or "opine on whether [the plaintiff's] composition is so unique that an identical work must be the product of copying."  No. 13 Civ. 00629 (MWF) (VBKx), 2014 WL 11456606, at *7 (C.D. Cal. Aug. 4, 2014).

Plaintiff's allegation concerning the "'identity' of the two works" also fails to plead striking similarity because the Hungarian Opinion does not find identity in the two works as a whole, but rather in a limited number of finite elements ("the theme head, the tempo (pulsation), the harmony and the sound (instrumentation)").  Hungarian Opinion 3.  Plaintiff's mischaracterization is significant because striking similarities must, inter alia, be "extensive," and the Hungarian Opinion makes no such finding of extensive similarities throughout the works.  *Price*, 499 F. Supp. 2d at 386 (citation omitted).

In any event, Plaintiff's Hungarian musicologists, by their own admission, are not competent to render an opinion under U.S. law.  Indeed, the Hungarian Council of Copyright Experts goes out of its way to underscore that its "competence" is limited to opining on "the interpretation of Hungarian law (primarily the [Hungarian] Copyright Act) and the related Hungarian legal practice."  Hungarian Opinion 2.  It is therefore not surprising that the Hungarian Opinion never once uses the words "striking similarity," which is a concept under U.S. law.

In sum, the Hungarian Opinion's qualified statements are not the "unequivocal opinion" that is required to satisfy the stringent test of striking similarity. *Horizon Comics*, 2019 WL 3080847, at *6; *cf. Repp*, 132 F.3d at 890–91 (standard met where opinions were "unequivocal," "strong," and "supported"). Plaintiff effectively conceded as much when he pleaded in his first two complaints that the Hungarian musicologists concluded that the works were only "substantially similar," not strikingly similar. First Am. Compl. ¶ 29 n.5; Compl. ¶ 28 n.5.

## 2. The SAC Does Not Allege Any Striking Similarities in Protectable Expression, and in Fact Concedes Dissimilarities

Given that Plaintiff's own experts do not conclude that the works are strikingly similar, the Court need not further analyze any claimed striking similarities. The case of *Jorgensen v. Careers BMG Music Publishing*, No. 01 Civ. 0357 (LAP), 2002 WL 1492123 (S.D.N.Y. July 11, 2002), is instructive. In that case, the court rejected the plaintiff's claim of striking similarity where he similarly relied on two experts: Judith Finell, who concluded that the works were substantially similar (as she did here), and a second expert who offered an unsupported preliminary opinion that (like the Hungarian Opinion) was insufficient to meet the stringent test of striking similarity. *Id.* at *5. Given the fact that these expert opinions failed to provide a basis for finding striking similarity, the court held that the plaintiff failed to create a triable issue of fact, thus obviating any need to analyze the works themselves. *Id.*

Similarly, this Court need not delve into a musicological comparison of the two works; it can dismiss this case on the failure of Plaintiff's own experts to conclude that the works are strikingly similar. *See id.* This is particularly so because "[i]n a technical area such as music, expert testimony is generally needed to establish striking similarity." *Turner*, 2014 WL 11456606, at *7. If Plaintiff's own experts cannot proffer evidence of striking similarity,

Plaintiff's claims "do not admit a jury finding of striking similarity," and the complaint must be dismissed.  *Wager v. Littell*, 549 F. App'x 32, 34 (2d Cir. 2014).

Nonetheless, the SAC does not provide an adequate independent basis for an allegation of striking similarity.  A striking similarity claim requires the plaintiff to allege facts supporting striking similarity.  *Wager v. Littell*, No. 12 Civ. 1292 (TPG), 2013 WL 1234951, at *4 (S.D.N.Y. Mar. 26, 2013), *aff'd*, 549 F. App'x 32 (2d Cir. 2014); *see also Vargas*, 514 F. Supp. 2d at 443.  Further, the claimed striking "similarities between [the works]" must be "extensive." *Price*, 499 F. Supp. 2d at 386 (citation omitted).

Here, Plaintiff enumerates a series of supposed similarities that are in fact common musical elements and consequently are not protectable under copyright law and cannot form the basis of a claim of striking similarity.  "The striking similar[ity] test is applied with 'particular stringency' in cases involving popular music, because the 'limited number of notes and chords' utilized in this musical genre often result in 'common themes' that reappear in otherwise distinct compositions."  *Chafir*, 2007 WL 2702211, at *4 (quoting *Tisi v. Patrick*, 97 F. Supp. 2d 539, 548 (S.D.N.Y. 2000)).

Here, Plaintiff alleges that the *Linda* and *X-Men* theme songs have a similar short musical phrase (that is primarily an arpeggio[12]), are in the same key, have about the same tempo, share a harmonization, and both use a synthesizer with "rhythm accompaniment."  SAC ¶ 34.  Each of these are common, non-protectable musical elements and cannot support a claim of striking similarity.  *See Skidmore v. Led Zeppelin*, No. 16-56057, 2020 WL 1128808, at *14–15 (9th Cir.

---

[12] "Three or more notes or pitches sounded simultaneously are called chords, and an arpeggio, sometimes called a broken chord, is '[a] chord whose pitches are sounded successively, . . . rather than simultaneously.'"  *Skidmore v. Led Zeppelin*, No. 16-56057, 2020 WL 1128808, at *14 (9th Cir. Mar. 9, 2020) (alteration in original) (quoting *Arpeggio, Chromatic, and Chord*, HARVARD DICTIONARY OF MUSIC (Don Michael Randel ed., 4th ed. 2003)).

Mar. 9, 2020); *Repp v. Webber*, 947 F. Supp. 105, 116 (S.D.N.Y. 1996), *aff'd*, 132 F.3d 882 (2d Cir. 1997); *Tisi*, 97 F. Supp. 2d at 548–49 (holding that key, tempo, chord structure/harmonic progression, guitar rhythm, and chords are "basic, non-protectible musical elements"); *see also Davis v. Raymond*, No. 12 Civ. 22578, 2012 WL 12868729, at *4 (S.D. Fla. Nov. 30, 2012).

Moreover, Plaintiff concedes that the two songs have differences—or as he self-servingly describes them, "minor alterations"—that further undermine his claim of striking similarity. SAC ¶ 34; *see Davis*, 2012 WL 12868729, at *4 (granting motion to dismiss and rejecting striking similarity where plaintiff "admits that discrepancies exist between the two songs" by pleading that the work was "slightly altered" with "minor changes"). For example, as Plaintiff admits, the *X-Men* theme changes to a different key, whereas the *Linda* theme does not. SAC ¶ 34. Moreover, the *X-Men* theme has an introduction and two transition sequences that bear no resemblance to the *Linda* theme, and the *Linda* theme likewise has multiple extended sequences that are completely unlike the *X-Men* theme.[13] Plaintiff makes no attempt to allege similarities in these other sequences because there are none. *See Watt v. Butler*, 744 F. Supp. 2d 1315, 1324 (N.D. Ga. 2010) (holding that significant dissimilarities in transitional sequences "weigh heavily against a finding of striking similarity"), *aff'd*, 457 F. App'x 856 (11th Cir. 2012). These discrepancies undermine the notion of "extensive" similarities between the works and are fatal to Plaintiff's claim of striking similarity. *Price*, 499 F. Supp. 2d at 386 (citation omitted); *see Tisi*, 97 F. Supp. 2d at 548–49.

---

[13] *See* SAC ¶ 32 n.4 (citing https://www.youtube.com/watch?v=sAkL2-vh2Sk); SAC ¶ 17 n.3 (citing https://www.youtube.com/watch?v=uMzVf8Ww8Y8). In copyright infringement actions, the works themselves control over "any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation omitted).

C.     The SAC's Allegations of Secondary Liability Are Wholly Conclusory

While not alleged in the prior complaints or in response to Defendants' initial pre-motion letters, Plaintiff now asserts claims for secondary infringement under contributory and vicarious theories.  To allege contributory infringement, the plaintiff must first show direct infringement, and that the defendant, "[1] with knowledge of the infringing activity, [2] induces, causes, or materially contributes to the infringing conduct of another."  *Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).  To allege vicarious infringement, the plaintiff must likewise show direct infringement, and that the defendant "[1] had the right and ability to supervise the infringing activity and . . . [2] has a direct financial interest in such activities."  *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 423, 434–35 (S.D.N.Y. 2011) (alterations in original) (quoting *Gershwin*, 443 F.2d at 1162).

However, Plaintiff fails to allege any facts that support secondary infringement or even to identify the direct infringers for whose actions Defendants are supposedly secondarily liable. Rather, Plaintiff simply parrots the legal elements of claims for contributory and vicarious infringement.  *See* SAC ¶ 57 ("With knowledge of the infringement, Defendants Chappell, BVT, Saban, Levy, and Wasserman have induced, caused or materially contributed to the infringing conduct of others, such that they should be found to be contributorily liable."); SAC ¶ 58 ("Defendants Marvel, Chappell, Disney, BVT, Saban, and Levy have had the right and ability to control other infringers and have derived a direct financial benefit from that infringement such that Defendants should be found to be vicariously liable.").  These wholly conclusory and vague allegations do not suffice to state a claim for secondary liability.

V.     **CONCLUSION**

For all the foregoing reasons, the Court should dismiss the SAC with prejudice.

Respectfully submitted,

JENNER & BLOCK LLP


By: /s/ Andrew H. Bart
    Andrew H. Bart
    Raphael Holoszyc-Pimentel
    919 Third Avenue
    New York, NY 10022
    +1 212 891 1600
    abart@jenner.com
    rhp@jenner.com
    *Counsel for Defendants Marvel*
    *Entertainment, LLC; Warner Chappell*
    *Music, Inc.; The Walt Disney Company; Fox*
    *Corporation; Buena Vista Television, LLC;*
    *NBCUniversal Media, LLC; Amazon.com,*
    *Inc.; and Apple Inc.*

Dated:  April 14, 2020