UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

  ZOLTAN KRISKO,                      :
                                         :

                        Plaintiff,    :

           -v-                :        1:19-cv-9256-GHW

  MARVEL ENTERTAINMENT, LLC, WARNER :        <u>MEMORANDUM OPINION</u>
  CHAPPELL MUSIC, INC., THE WALT    :            <u>AND ORDER</u>
  DISNEY CO. FOX CORP., BUENA VISTA  :
  TELEVISION, LLC, NBCUNIVERSAL MEDIA, :
  LLC, AMAZON.COM, INC., APPLE, INC.,  :
  RONALD AARON WASSERMAN, SHUKI   :
  LEVY, HAIM SABAN,                 :
                                       :
                     Defendants.   :
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/21/2020

GREGORY H. WOODS, United States District Judge:

      Professor Xavier's School for Gifted Youngsters was built to defend the different.  Mutants

travel (or teleport) from all over the world to shelter within the institute's walls, and learn to cultivate

their abilities to protect what makes them unique.  For those of us who sadly lack the X-gene,

copyright law provides something similar:  it safeguards the rights of the unique and gifted by

protecting their original creations.

      This is a case about an alleged invasion of those rights.  The question before the Court is

whether Zoltan Krisko has adequately pleaded that two pieces of music—one written in Hungary

and one in California—are so strikingly similar that he will be permitted to take discovery to try to

prove his claims of copyright infringement.  Because the Court finds that he has, and for the reasons

that follow, the motions to dismiss are granted in part and denied in part.

I.   **Facts**[1]

This case involves one very simple question:  did the composers of a theme song featured in an allegedly famous American animated television show copy that theme song from an allegedly famous Hungarian cop drama?

The two television shows at the heart of this dispute are *Linda* and *X-Men:  The Animated Series* (referred to as "*X-Men*" here for brevity).  *Linda* is a 1980s-era Hungarian "comedy thriller," produced by MAFILM, a Hungarian film production company, that ran for seventeen episodes between 1984 and 1991, and was one of the most popular Hungarian television shows of its time. Second Amended Complaint ("SAC"), Dkt. No. 60 ¶¶ 17–18.  Renowned for more than just its filmography, *Linda* boasted an "iconic" soundtrack authored by Gyorgy Vukan, a famous Hungarian composer and pianist who won numerous Hungarian and international awards and composed over a hundred and fifty film scores.  *See* SAC ¶¶ 17–18, 20.  According to Plaintiff's "information and belief," *Linda* also aired abroad; between 1984 and 1992, its seventeen episodes played in forty countries, slipping past the Iron Curtain and landing in places as far-flung as China and Japan.  SAC ¶ 19.

*X-Men* is an animated television show created by a Marvel Entertainment, LLC ("Marvel") predecessor[2] and launched in 1992, airing seventy-six episodes between 1992 and 1997.  *See* SAC ¶¶ 30, 33.  The music for *X-Men*'s opening theme was created by Saban Entertainment and substantially contributed to the show's success.  *See* SAC ¶¶ 31, 35.  Marvel has used the music time

---

[1] Unless otherwise noted, the facts are taken from the complaint and accepted as true for purposes of this opinion.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  Still, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[2] Marvel was founded in June 1998, formed by the merger of Marvel Entertainment Group and another company.  SAC ¶ 6.  For the purposes of this opinion—because it does not at all change the analysis—Marvel and its predecessors will all be referred to as "Marvel."

and time again—to promote new episodes and sell other merchandise as recently as 2017. *See* SAC ¶ 36.

After discovering the *X-Men* theme song in 2017, Zoltan Krisko—a Florida resident and *Linda*'s copyright holder—sued a bevy of individuals and entertainment companies, alleging that they infringed *Linda*'s "primary melodic theme" that repeats in both songs. *See* SAC ¶¶ 5, 34. For clarity, this opinion will refer to these defendants in three groups—the "Media Defendants," comprising Marvel, Warner Chappell Music, Inc. ("Chappell"), The Walt Disney Company ("Disney"), FOX Corporation ("Fox"), Buena Vista Television, LLC ("BVT"), NBCUniversal Media, LLC ("NBC"), Amazon.Com, Inc. ("Amazon"), and Apple, Inc. ("Apple"); the "Saban Entertainment Defendants": Haim Saban and Shuki Levy; and Ronald Aaron Wasserman.

Need an introduction to the *dramatis personae*? Haim Saban and Shuki Levy are the former owners and founders of Saban Entertainment. *See* SAC ¶¶ 27–28. Ronald Wasserman was a Saban Entertainment employee in the 1990s, and, along with Saban and Levy, has been credited with composing the *X-Men* theme song. *See* SAC ¶¶ 26–28. BVT is the successor of Saban Entertainment, the initial owner of the *X-Men* theme song copyright, and produces and distributes all *X-Men* related media. *See* SAC ¶ 10. Chappell is the currently registered copyright claimant of the *X-Men* theme song. *See* SAC ¶ 7.[3] Fox is the successor of the original airing distribution companies of *X-Men*. SAC ¶ 9. Disney is the successor of *X-Men*'s original production company. *See* SAC ¶ 8. And NBC, Amazon, and Apple are distributors (or the successors of distributors) of *X-Men*. *See* SAC ¶¶ 11–13. Defendants Disney, BVT, Fox, NBC, Amazon, and Apple have all distributed X-Men in various forms over the years. *See* SAC ¶¶ 40–41. Marvel has also used the *X-Men* theme song to promote merchandise such as action figures. *See* SAC ¶ 42.

---

[3] Saban Entertainment sold the rights to *X-Men*'s soundtrack to Marvel, who later sold it to Chappell.

The reader might be wondering how Haim Saban, Shuki Levy, and Ronald Wasserman could have possibly watched a Hungarian cop show that aired in a communist country during the Cold War. Good question. According to Krisko, Saban and Levy both lived in Paris in the early 1980s and maintained strong professional contacts with European professionals even after their move to Los Angeles in the mid-1980s. *See* SAC ¶ 21. Saban and Levy composed music for a number of cartoons and animated features, including the 1984 French film *Le Secret des Selenities*, directed by the Hungarian-French filmmaker Jean Image. *See* SAC ¶ 21.

Jean Image retained strong, active ties to the Hungarian film community and visited the country multiple times, including in 1983. *See* SAC ¶ 22. The protagonist of *Le Secret des Selenites*, Baron Munchausen, was also the protagonist of Image's 1979 film *Les Fabuleuses Aventures du legendaire Baron du Munchausen*, which was produced in collaboration with Pannonia Filmstudio, a MAFILM affiliate and world-class Hungarian animation workshop. *See* SAC ¶¶ 20, 22–23, 29. *Le Secret des Selenites* even premiered in Hungary at Pannonia in 1984, and was dubbed in Hungarian prior to its first showing. *See* SAC ¶ 22.

According to Krisko, producers and composers of animated films were typically invited to, and frequently attended, the Hungarian premieres of their work. *See* SAC ¶ 24. As such, he alleges, it would have been customary for Image, Saban, and Levy to have been invited to and attend the Hungarian premiere of *Le Secret des Selenites* at Pannonia. At that time, Pannonia was collaborating with MAFILM, creating *Linda*'s opening animation sequence, over which its theme song plays. *See* SAC ¶ 23. It was one of Pannonia's highest-profile projects. *See* SAC ¶ 23. Krisko theorizes that while at Pannonia in 1984, Saban and Levy had a reasonable opportunity to hear Vukan's composition.

Krisko filed this case *pro se* in October 2019.  *See* Dkt. No. 1.  He acquired counsel soon thereafter,[4] and amended his complaint once in January 2020 to add Defendant NBC, *see* Dkt. No. 32, and then, on consent, more substantially in March 2020, *see* Dkt. No. 60.

Since then, the defendants in this case filed a number of motions:  the Media Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* Dkt. No. 74 ("Media Defs.' Mot."), the Saban Entertainment Defendants joined in the Media Defendants' motion, *see* Dkt. No. 78, and Wasserman filed his own motion to dismiss, primarily alleging that the Court lacks jurisdiction over him, but also joining in the substantive portion of the Media Defendants' briefing, *see* Dkt. No. 76.  Krisko authored two oppositions—a jurisdictional one, *see* Dkt. No. 81 ("Jx Opp'n") and substantive one, *see* Dkt. No. 79 ("MTD Opp'n")—and all three groups of defendants replied, *see* Dkt. No. 84, Dkt. No. 85 ("Media. Defs.' Reply"), and Dkt. No. 86.

## II.   Legal Standard

### A.  Jurisdiction

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) ("*Penguin I*"); *see also Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013).  To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  At the pleading stage—and prior to discovery—a plaintiff need make only a *prima facie* showing that jurisdiction exists.  *Id.* at 84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("'In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must

---

[4] Counsel for Plaintiff noticed their appearance on December 19, 2019.  *See* Dkt Nos. 9–10.

make a prima facie showing that jurisdiction exists.'" (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013))).

If a court considers only pleadings and affidavits, the plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking*, 989 F.2d at 580 (citation omitted).

### B. Motion to Dismiss

A Rule 12(b)(6) motion challenges the sufficiency of a complaint's allegations. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). To avoid dismissal, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Twombly*, 550 U.S. at 544).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  But a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

## III.   Discussion

### A.  The Court's Jurisdiction Over Ronald Wasserman

Although Krisko invokes all three subsections of New York's long-arm statute in support of the Court's exercise of specific jurisdiction over Ronald Wasserman, "no law, no code" confers the necessary authority for the Court to do so.

Because "[t]he Copyright Act, 17 U.S.C. § 101 *et seq.*, does not provide for nationwide service of process," a federal court adjudicating a copyright dispute applies the personal jurisdictional rules of the forum state.  *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000).  This requires engaging in a two-part analysis:  "First, a district court must determine whether, under the laws of the forum state (New York in this case), there is jurisdiction over the defendant.   Second, it must determine whether an exercise of jurisdiction under these laws is consistent with federal due process requirements."  *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005) (quotation marks, citations, and brackets omitted).

Under New York's long-arm statute:

> a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
> (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> (2) commits a tortious act within the state, except as to a cause of action for defamation or character arising from the act; or

(3) commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; . . .

N.Y. C.P.L.R. § 302(a).  Although Krisko invokes subsections (a)(1), (a)(2), and (a)(3)(ii) in support of the Court's exercise of jurisdiction here, none strike home.

### 1. Section 302(a)(1)

The second amended complaint is bereft of any allegation that Wasserman either transacted any business in New York, or contracted to supply any goods or services in New York.  Section "302(a)(1) jurisdiction is proper even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (internal quotation marks and citation omitted).  The key word here is *purposeful*: a defendant must "avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Id.* (quotation omitted); *see also DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 421 (S.D.N.Y. 2010).

Nothing in the second amended complaint suggests—much less makes out a *prima facia* case—that Wasserman purposefully availed himself of the privilege of conducting business in New York.  Wasserman lives in California.  *See* SAC ¶ 14.  Thirty years ago, he worked for two Californians in, presumably, California.[5]  Seemingly acknowledging this fatal flaw, Krisko theorizes that even though Wasserman never did any business in New York, and never contracted to supply any goods or service in New York, he *did* provide the *X-Men* theme song "to Saban Entertainment as part of his employment contract, and Saban Entertainment in turn contracted with Marvel and

---

[5] The second amended complaint is completely silent with respect to Saban Entertainment's former location, but notes that Saban and Levy, Saban Entertainment's founders, moved to Los Angeles together in the 1980s. *See* SAC ¶ 21.

Fox in New York for the theme to be broadcast in New York—all things Wasserman knew would happen."  *See* Jx Opp'n at 17.

To bolster his theory of how that daisy chain of contractual relationships concludes in jurisdiction under section 302(a)(1), Krisko has pointed to only one case:  *Firma Melodiya v. ZYX Music GMBH*, No. 94-cv-6798 (DC), 1995 WL 28493 (S.D.N.Y. Jan. 25, 1995).  But nothing about the reasoning there is applicable here.  In *Firma Melodiya*, then-District Judge Chin concluded that granting a license to a third party to exploit recordings in the U.S. and marketing of recordings in New York was sufficient to confer jurisdiction under the long-arm statute's "transacting business" test.  *See Firma Melodiya*, 1995 WL 28493, at *2.  This case is not an anomaly; New York courts in copyright infringement cases have frequently asserted jurisdiction over non-domiciliary defendants based on distribution agreements that generally authorized the licensing of songs in New York.  *See UTC Fire & Sec. Ams. Corp. v. NCS Power, Inc.*, 844 F. Supp. 2d 366, 373 (S.D.N.Y. 2012) (citing cases).  And that makes sense—those defendants have *purposefully* availed themselves of the privilege of doing business in New York by choosing to distribute their work to companies who will, in turn, exploit the license in New York.  But *Firma Melodiya* does not support a finding that Wasserman purposefully availed himself of the privilege of doing business in New York in deciding to work for a company that he, at some point, allegedly knew would sell his compositions to national entertainment companies.  Indeed, so far as the Court is aware, no court has mutated section 302(a)(1) into that far-reaching a statute.[6]

Any connections Wasserman's work on the *X-Men* theme song have to New York are random, fortuitous, and attenuated, and, thus, do not merit this Court's exercise of jurisdiction over him pursuant to C.P.L.R. 302(a)(1).

---

[6] Furthermore, even if Krisko's jurisdictional theory had claws, it relies on facts absent from the second amended complaint.  For one, Krisko relies on the fact that Wasserman had an employment contract to provide compositions to Saban Entertainment.  *See* Jx. Opp'n at 17.  That fact does not appear in the second amended complaint.

## 2.  Section 302(a)(2)

C.P.L.R. § 302(a)(2) also does not confer jurisdiction here for one simple reason: Wasserman did not commit a tort in New York.  To establish personal jurisdiction under section 302(a)(2), a defendant must have committed a tortious act in New York.  *See DirecTV Latin Am.*, 691 F. Supp. 2d. at 418.  New York courts and the Second Circuit have "consistently interpreted § 302(a)(2) jurisdiction narrowly."  *Carlson v. Cuevas*, 932 F. Supp. 76, 79 (S.D.N.Y. 1996) (citing cases).  Thus, for jurisdiction to attach under this subsection, a defendant's tortious act must have occurred while the defendant was physically present in New York.  *See DirecTV Latin Am.*, 691 F. Supp. 2d. at 418 (collecting cases).

Alternatively, a defendant's agent could be physically present in New York.  "To be considered an agent for jurisdictional purposes, the alleged agent must have acted in the state for the benefit of, and with the knowledge and consent of the non-resident principal," and the principal must also have "some control over the agent."  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir.1986) (internal quotation marks and citations omitted).

Krisko acknowledges that Wasserman was never physically present in New York.  *See* Jx. Opp'n at 5.  Instead, Krisko relies on the assertion that "Marvel and other defendants committed copyright infringement while in New York, and were acting as Wasserman's agent, for purposes of this statute, when they did so."  Jx Opp'n at 5.  But there are no facts in the second amended complaint to support the inference that Marvel or any of the other Media Defendants acted as Wasserman's agent in distributing his work in New York.  Just one paragraph in the complaint describes Wasserman's work at Saban Entertainment, and it makes only the briefest mention of either Marvel or Fox:

> On information and belief, Wasserman knew when he composed the theme that it
> would be aired on national television throughout the United States, including in New
> York, and that this would occur through Marvel and Fox, both New York
> companies.  He specifically wrote the theme music with the plan for it to be used for

> X-Men:  The Animated Series, a show which he knew was created by Marvel and
> aired on Fox.

SAC ¶ 26.  Krisko has failed to allege that Marvel and Fox worked on Wasserman's behalf and with

consent in distributing his composition.  All that the complaint alleges is that Wasserman was a

Saban Entertainment employee.  *See* SAC ¶ 26.  His work was sold by his superiors to media

companies in New York.  *See* SAC ¶ 47 ("Saban Entertainment sold the rights to the opening theme

and soundtrack of X-Men: The Animated Series to Marvel Enterprises for an unknown amount.").

The Court therefore cannot exercise jurisdiction over Wasserman pursuant to section 302(a)(2).

### 3.  Section 302(a)(3)

Finally, section 302(a)(3)(ii) also plainly does not confer jurisdiction over Wasserman.  To

establish personal jurisdiction under this subsection of New York's long-arm statute, five elements

must be met:

> (1) The defendant committed a tortious act outside the state; (2) the cause of action
> arose from that act; (3) the act caused injury to a person or property within the state;
> (4) the defendant expected or should reasonably have expected the act to have
> consequences in the state; (5) the defendant derives substantial revenue from
> interstate or international commerce."

*Penguin Grp. (USA), Inc. v. Am. Buddha)*, 16 N.Y.3d 295, 302 (2011).  "Each element of this test is

essential, and if plaintiff fails to proffer sufficient evidence for any element, it is dispositive of the

issue of personal jurisdiction under this provision."  *Yash Raj Films (USA) Inc. v. Dishant.com LLC*,

No. 08-cv-2715 (ENV) (RML), 2009 WL 4891764, at *8 (E.D.N.Y. Dec. 15, 2009) (internal

quotation marks and citation omitted).

Krisko never alleges that Wasserman's copyright infringement caused "injury to a person or

property within the State."  *Penguin I,* 609 F.3d at 32; *see also* N.Y. C.P.L.R. § 302(a)(3).  Krisko lives

in Florida.  *See* SAC ¶ 5.  The crux of his alleged injury is that the *Linda* theme song was copied and

the *X-Men* theme song was distributed all over the world.  He makes no allegation that any specific

business or licensing opportunities were lost in New York.  Krisko has therefore failed to allege "a

non-speculative and direct New York-based injury" to his intellectual property rights other than pure economic losses. *Troma Entm't*, 729 F.3d at 220. And "[i]t is well settled that such economic losses are not alone a sufficient basis for personal jurisdiction over the persons who caused them." *Id.* at 220–21.

A party "may not rely on 'conclusory non-fact-specific jurisdictional allegations to overcome a [Rule 12(b)(2)] motion to dismiss." *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 321 (S.D.N.Y. 2013) (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)). Because Krisko has failed to allege sufficient facts to support the Court's exercise of jurisdiction over Wasserman pursuant to New York's long-arm statute, the Court's jurisdictional inquiry ends here.

### 4. 28 U.S.C. § 1406(a)

Even when courts lack personal jurisdiction over a defendant, 28 U.S.C. § 1406(a) permits them to transfer an action to another district where the case could have been brought if it is in "the interest of justice" to do so. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 435 (2d Cir. 2005) (collecting cases). Because it is not in the interest of justice to transfer Krisko's claims against Wasserman to California, the Court will, instead, dismiss them.

Section 1406 was enacted to protect "plaintiffs who were diligent in initiating suit [from] forfeit[ing] their action as a result of venue quirks of which responsible plaintiffs would not necessarily have known." *Spar, Inc. v. Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992). It should not be used to "reward plaintiffs for their lack of diligence in choosing a proper forum." *Id.* Generally, the Second Circuit has found "[a] compelling reason for transfer" when "a plaintiff's case, if dismissed, would be time-barred on refiling in the proper forum." *Daniel,* 428 F.3d at 435 (internal quotation marks and citations omitted); *see also Minnette v. Time Warner,* 997 F.2d 1023, 1026 (2d Cir.1993) ("Given that the functional purpose of 28 U.S.C. § 1406(a) is to eliminate impediments to the timely disposition of cases and controversies on their merits, the transfer of this action, when the statute of limitations has run, is in the interest of justice."). This protection, however, is not

limitless; the Circuit has also explicitly warned against transfer when it would "reward plaintiffs for their lack of diligence in choosing a proper forum" and allow them to "bargain hunt" for forums after commencing an action. *Spar*, 956 F.2d at 394–95. Furthermore, courts can transfer cases only to districts that would otherwise have personal jurisdiction over the defendants, and the proponents of transfer bear the burden of establishing that the venue and jurisdiction are proper in the proposed district court. *See Wohlbach v. Ziady*, No. 17-cv-5790 (ER), 2018 WL 3611928, at *4 (S.D.N.Y. July 27, 2018).

Even assuming the Court *could* sever the claims against Wasserman and transfer them to the Central District of California—an issue Krisko entirely fails to brief—the Court finds that the interests of justice would not be served in doing so. Krisko was not diligent in choosing a proper forum for his case. After discovering the alleged copyright infringement in 2017, *see* SAC ¶ 57, Krisko waited until late 2019 to file his complaint, and his attorneys waited until mid-2020 to float the idea of a transfer in a two-paragraph-long coda in their opposition to Wasserman's motion to dismiss for lack of jurisdiction. *See* Jx Opp'n at 19–20.[7] And Krisko's decision to file his case against Wasserman in this District is not a result of "an erroneous guess with regard to the existence of some elusive fact of the kind upon which venue provisions often turn," *Spar*, 956 F.2d at 394, but his lack of diligence in researching New York's clear jurisdictional bar; as noted above, his complaint cites no facts stating a colorable basis for jurisdiction under New York's long-arm statute.

Furthermore, Krisko's request—more properly styled as a motion to transfer, rather than appended as an alternative argument in an opposition to Defendant Wasserman's motion to dismiss—provides no information that would permit this Court to determine whether the Central

---

[7] It is entirely unclear to the Court why Plaintiff waited so long to suggest this alternative form of relief. Wasserman certainly did not keep secret his intent to move to dismiss on jurisdictional grounds; he filed a letter on February 13, 2020, pursuant to the Court's Individual Rules of Civil Practice, requesting a pre-motion conference regarding his anticipated motion to dismiss. *See* Dkt. No. 47. That letter broadly—though briefly—describes all of the grounds upon which Wasserman intended to move for dismissal.

District of California would be the appropriate venue for Krisko's claims, or whether a court in that district could exercise personal jurisdiction over Wasserman.  *See* Jx Opp'n at 19–20.

In sum, the Court finds that Plaintiff has not provided the Court with any reasons why it would be in the interest of justice to transfer his claims against Defendant Wasserman rather than dismiss them.  Wasserman's motion to dismiss is therefore granted in full.

### B.  Plaintiff Adequately Pleaded His Copyright Infringement Claims

#### 1.  Legal Standard for Copyright Infringement

To prevail on a copyright infringement claim, "a plaintiff must establish three things:  1) that his work is protected by a valid copyright, 2) that the defendant copied his work, and 3) that the copying was wrongful."  *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014).[8]  This second prong—sometimes referred to as "actual copying" or "factual copying"—can be proved by either direct or indirect evidence.  *See Boisson v. Banian, Ltd*, 273 F.3d 262, 267 (2d Cir. 2001).  "Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material, and that there are similarities between the two works that are probative of copying."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (quotation marks and citations omitted).  But "[t]here is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required."  *Id.* at 56 (quotation omitted).  Thus, where two works are "so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access."  *Id.* (quotation omitted); *see also Repp & K & R Music, Inc. v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997).

---

[8] A certificate of registration from the United States Register of Copyrights constitutes *prima facie* evidence of the valid ownership of a copyright.  *See* 17 U.S.C. § 410(c).  Plaintiff alleges that he secured registration for the *Linda* theme in 2017, and Defendants do not dispute the validity of that copyright.  *See* SAC ¶ 18; SAC Ex. 1.

Whether copying was wrongful, on the other hand, presents a legal question—namely, whether the actual copying amounted to improper appropriation because "a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995) (quotation omitted).[9]  The amount that was copied must also be more than de minimis.  *See Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003).

In determining whether two works are "substantially similar," the Second Circuit requires that courts "apply the 'ordinary observer' test and ask whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Zalewski*, 754 F.3d at 102 (internal quotation marks and citations omitted).  Where a work's aesthetic appeal is due largely to unprotectable elements, however, courts "must be more discerning, and ignore those aspects of a work that are unprotectable . . . lest [courts] conflate mere copying with wrongful copying." *Id.* (quotation marks, citations, and brackets omitted).  In the context of musical plagiarism, the Second Circuit has characterized this "ordinary observer" test as requiring proof "that defendant took from plaintiff's works so much of what is pleasing to the ears of lay listeners, who comprise the audience for whom such music is composed, that defendant wrongfully appropriated something which belongs to the plaintiff." *Repp*, 132 F.3d at 889 (internal quotation and ellipses omitted); *see also Velez v. Sony Discos*, No. 05-cv-0615 (PKC), 2007 WL 120686, at *7 (S.D.N.Y. Jan. 16, 2007) (citing *Repp*, 132 F.3d at 889).

A district court adjudicating a motion to dismiss must typically confine its consideration to a "narrow universe of materials" and may "not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of

---

[9] This distinction reflects the fact that "not all copying results in copyright infringement . . . ." *Boisson*, 273 F.3d at 268.  That is because "[n]ot every portion or aspect of a copyrighted work is given copyright law's protection.  Copying these aspects of a work is not wrongful, and thus not all copying is wrongful." *Zalewski*, 754 F.3d at 100.

which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks, ellipses, and citation omitted).  Here, however, the second amended complaint cites both theme songs.  *See* SAC ¶¶ 17 n.3, 32 n.4.  If nothing else, both are clearly integral to the complaint; the plaintiff had actual notice of both songs and framed this entire lawsuit around their similarities.  *See Chambers*, 282 F.3d at 153; *see also DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (noting that for a document to be integral to the complaint, "the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the document in framing the complaint." (internal quotation marks, citations, and brackets omitted)).  Indeed, the complaint is rife with references to both pieces, and requests judicial evaluation of whether one infringed the other.

"In copyright infringement actions, the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks and citation omitted).  And, generally, where "the works in question are attached to a plaintiff's complaint, it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation."  *Id.*  "Courts in this district regularly apply this rule in music copyright cases to listen to the songs at issue when evaluating a motion to dismiss."  *McDonald v. West*, 138 F. Supp. 3d 448, 453 (S.D.N.Y. 2015), *aff'd*, 669 F. App'x 59 (2d Cir. 2016) (collecting cases).

### 2.  Striking Similarity

Notwithstanding the Media Defendants' flurry of arguments to the contrary, Krisko has adequately pleaded striking similarity, excusing him from pleading access.[10]  Striking similarity is a

---

[10] Because Krisko has adequately pleaded striking similarity, the Court need not wade into the plausibility of Plaintiff's storytelling just yet.

stringent standard.  It requires that a plaintiff plead that two works are "so identical as to preclude any reasonable possibility of independent creation."  *Dimmie v. Carey*, 88 F. Supp. 2d 142, 150 (S.D.N.Y. 2000); *see also Dress Barn*, 2019 WL 1949675, at *3 (citing *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997)).  Plaintiff's complaint does exactly that; in support of his claim that the "subject" of the *Linda* and *X-Men* themes are strikingly similar, he offers a laundry list of similarities that "reach the very essence of each work":

(1) "The subject is 'exactly the same,' 'note by note,' with one exception."
(2) "The key of the two works is identical:  C minor."
(3) "The tempo is identical:  about 124 BPM."
(4) "The harmonization is the same:  Vukan sounds a C minor harmony based on grade 1 of the basic key, and so does the infringing theme song of X-Men: The Animated Series."
(5) "When the infringing work repeats the subject on the IVth grade, then the harmony is also IVth grade (F minor)."
(6) "Both works use a synthesizer with rhythm accompaniment."
(7) "The X-Men theme contains several sound effects that occur at the same places as very similar sound effects used in the Linda theme."

SAC ¶ 34.  After describing these features, the complaint briefly mentions that a "governmental panel of independent" Hungarian copyright experts analyzed the two theme songs and concluded that "it is hardly possible for one work to have been created without knowledge of the other."  SAC ¶ 34.  This opinion by the Hungarian Counsel of Copyright Experts ("the Hungarian Opinion") is referenced generally, provided as an additional example supporting Plaintiff's contention that the two theme songs are strikingly similar.

In moving to dismiss, the Media Defendants primarily focus their attention on the substance of the Hungarian Opinion, challenging its accuracy with wolverine ferocity.  In their view, the Hungarian Opinion does not meet the "stringent standard" for striking similarity applied by courts on summary judgment, where "a purported expert must 'scrupulously' meet without equivocation by showing 'no possibility of independent creation.'"  Media Defs.' Mot. at 18 (quoting *Vargas v. Transeau*, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007) (citations omitted), *aff'd sub nom. Vargas v. Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009)).

This monocular, laser-focus is misplaced.  First, the Court need not—and did not—consider the Hungarian Opinion when deciding that the complaint here adequately pleads striking similarity.[11] Regardless of the content of the Hungarian Opinion, Krisko details enough facts that, taken together, sufficiently permit his complaint to survive Defendants' motions.  Indeed, he asserts that the "subject" is exactly the same in both songs—and numerous courts in this district have recognized that "it is the melody which is the most important feature of the music." *Siskind v. Newton-John*, No. 84-cv-2634, 1987 WL 11701, at *5 (S.D.N.Y. May 22, 1987).

Second, and more important, this is not a motion for summary judgment.  True, *proving* striking similarity is certainly a heavy burden; ultimately, Krisko will not be able to rely on "[t]he mere existence of multiple similarities"—those similarities must be so striking so as to compel the conclusion that "copying is the only realistic basis for them." *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 543 (S.D.N.Y. 2007).  Cases about music are tricky; as the leading treatise on copyright law notes, "expert testimony may be necessary to establish striking similarity in 'technical' areas, such as music[.]"  4 Nimmer on Copyright § 13.02; *see also Repp*, 132 F.3d at 891 (criticizing the district court for relying, "[i]n the face of plaintiffs' expert testimony . . . upon its own 'aural examination'" of the two songs in finding an absence of striking similarity on summary judgment).  But at the motion to dismiss stage, an allegation of striking similarity need only be plausible to survive. *See L.A. T-Shirt & Print, Inc. v. Rue 21, Inc.*, No. 16-CV-5400 (RA), 2017 WL 3575699, at *8 (S.D.N.Y. Aug. 17, 2017).

---

[11] The Media Defendants assume—and Krisko does not challenge—that the Hungarian Opinion is incorporated by reference into the complaint.  *See* Media Defs.' Mot. at 17, 19 n.10; MTD Opp'n at 16–22. Because the Court need not review the Opinion to determine that Plaintiff has met his burden, the Court will not address the question.  Still, the Court is skeptical that four sentences generally describing an opinion in a foreign language that the Plaintiff does not specifically cite are enough to incorporate the Hungarian Opinion into the complaint by reference.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (finding that paraphrasing from a transcript and inserting a single quotation is insufficient for incorporation by reference because "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint"); *see also Stolarik v. N.Y. Times Co.*, 323 F. Supp. 3d 523, 537 (S.D.N.Y. 2018) (requiring "a clear, definite and substantial reference to the documents" to find incorporation by reference).

Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

Alternatively, the Media Defendants fault Plaintiff for conceding that the songs feature some "minor alterations"—arguing that these admissions undermine Plaintiff's allegations of striking similarity. Media Defs.' Mot. at 23. In support, the Media Defendants cite a case from the Southern District of Florida where a plaintiff pleaded only that the harmonic progressions in his song "Let's Go" and Usher's "Hey Daddy (Daddy's Home)" were identical—nothing else. *See Davis v. Raymond*, No. 12-cv-22578, 2012 WL 12868729, at *4 (S.D. Fla. Nov. 30, 2012); Media Defs.' Mot. at 23. This case is inapposite; the fact that the plaintiff "admit[ted] that discrepancies exist between the two songs, describing the incorporation of his work into Usher's song as 'slightly altered' and with 'minor changes,'" did not, by itself, drive the court's decision to grant the motion to dismiss. *Id.* The fact that the plaintiff could allege only one similarity between the two songs certainly did not help his cause. In contrast, Krisko alleges a laundry list of similarities between the two theme songs. Plus, the mere existence of differences does not preclude two works from otherwise being strikingly similar; as Judge Hand put it, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936); *see also Levine v. McDonald's Corp.*, 735 F. Supp. 92, 96 (S.D.N.Y. 1990) (determining that differences in the underlying melody of two songs did not defeat a claim of striking similarity on summary judgment).

Finally, the Media Defendants ask the Court to find that any similarities between the *X-Men* theme song and *Linda* are not probative of copying because Plaintiff's list of similarities feature common musical elements that cannot sustain a claim of striking similarity.[12] Fair point; courts must

---

[12] The Media Defendants use both "non-protectable" and "common" to describe the overlapping elements between the two theme songs. *See* Media Defs.' Mot. at 22; Media Defs.' Reply at 8. Despite invoking the word "protectable" a number of times in their brief, the Media Defendants challenge only the sufficiency of Krisko's allegations of actual copying, rather than wrongful copying. *See* Media Defs.' Mot at 21–23. To be

be "mindful of the limited number of notes and chords available to composers and the resulting fact

that common themes frequently reappear in various compositions, especially in popular music."

*Gaste v. Kaiserman*, 863 F.2d 1061, 1068–69 (2d Cir. 1988). "Thus, striking similarity between pieces

of popular music must extend beyond themes that could have been derived from a common source

or themes that are so trite as to be likely to reappear in many compositions." *Id.*; *see also Velez*, 2007

WL 120686, at *10 (two songs similar only in that they both use "4/4 time," or employ a "structural

idea of two eight-measure phrases," is "not, without more, a probative similarity because [those

elements are] so commonplace that it is not unlikely to arise [in] independently created works");

*McDonald v. Multimedia Entm't, Inc.*, No. 90-cv-6356 (KC) 1991 WL 311921, at *4 (S.D.N.Y. July 19,

1991) (three-note sequence that is "a common and much-used tone in traditional western music"

---

clear, had the Media Defendants also argued that Krisko failed to adequately plead that the portions of *Linda* that were actually copied amount to an "improper or unlawful appropriation," *Jorgensen*, 351 F.3d at 51, the Court would have had to determine whether Krisko had pleaded wrongful copying. *See, e.g.*, *New Old Music Grp., Inc. v. Gottwald*, 122 F. Supp. 3d 78, 93 (S.D.N.Y. 2015). Because they did not, the Court focuses its analysis accordingly.

 Still, clarifying the difference here may be analytically helpful for the reader; confusion arises because similarity can often prove both actual copying and wrongful copying. *See Zalewski*, 754 F.3d at 101. Courts have also contributed to this disorientation by, rather unfortunately, using the phrase "substantial similarity" when referring to both actual and wrongful copying, *see, e.g.*, *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995), even though factual copying requires only "probative similarity" or, when a plaintiff fails to allege access, "striking similarity." As the Second Circuit has since clarified, these are not distinctions without differences:

> Obviously, if two paragraphs are identical, a reasonable inference is that the second paragraph was copied from the first. If the copied paragraph contains only protected material, then this similarity is also strong evidence that the copying was wrongful. . . . When an original work contains many *un*protected elements, however, a close similarity between it and a copy may prove only copying, not wrongful copying. This is because the similarity may derive only from these unprotected elements. For clarity, the term 'substantial similarity' is properly reserved for similarity that exists between the protected elements of a work and another work. If two works are substantially similar, any copying was wrongful. By contrast, similarity that relates to unprotected elements is probative only of copying—not wrongful copying—and is referred to as probative similarity.

*Zalewski*, 754 F.3d at 101 (internal quotation marks and citations omitted). In other words, whether elements of a work are protectible under copyright law will influence whether any copying was wrongful, not necessarily whether any copying actually took place. Put differently:

> First, there is the factual question whether the defendant, in creating its work, used the plaintiff's material as a model, template, or even inspiration. If the answer is 'yes,' then one can conclude, as a factual proposition, that copying may have occurred. But the question remains whether such copying is actionable. In other words, that first answer does not vouchsafe resolution of the legal question whether such copying as took place gives rise to liability for infringement.

4 Nimmer on Copyright § 13.01.

cannot raise an inference of copying); *cf. Siskind v. Newton-John*, No. 84-cv-2634, 1987 WL 11701, at *5 (S.D.N.Y. May 22, 1987) ("The limited rhythmic similarities relate to the rhythm of the words and do not indicate copying of plaintiff's rhythm.  To the extent that there are similarities in harmonic progressions, it is a matter of standard or usual harmonic progressions, something which does not indicate copying.  In any event, it is the melody which is the most important feature of the music, and the melodies in plaintiff's and defendants' works are quite different.").  But Krisko alleges that, among other things, the melodies in the two songs are strikingly similar—not just that two short musical phrases "are in the same key, have about the same tempo, share a harmonization, and . . . use a synthesizer with rhythm accompaniment."  Media Defs.' Mot. at 22 (quotations omitted).  For now, that is enough.

A complaint need not be as solid as adamantium to survive a motion to dismiss.  Because Krisko has sufficiently pleaded that the *Linda* and *X-Men* theme songs are plausibly strikingly similar, his second amended complaint survives the Media Defendants' motion.

### C.  Secondary Liability

Krisko has attempted to pin secondary liability on a number of defendants, employing the theories of contributory and vicarious liability.  Although "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 658 (S.D.N.Y. 2013) (Sullivan, J.) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434 (1984)), federal common law imposes secondary liability "on a party that has not directly infringed a copyright, but has played a significant role in direct infringement committed by others . . . ." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 422 (S.D.N.Y. 2011).  The Court discusses each of the two theories Krisko invokes in turn.

### 1. Contributory Infringement

Krisko has not alleged any facts supporting the inference that Chappell or BVT are secondarily liable under a theory of contributory infringement—just that Saban and Levy might be.[13] "Contributory infringement occurs where 'one . . with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'" *ReDigi*, 934 F. Supp. 2d at 658 (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010). "The knowledge requirement is 'objective' and satisfied where the defendant knew or had reason to know of the infringing activity." *Id.* (citing *Arista Records*, 604 F.3d at 118). "Further, the support must be 'more than a mere quantitative contribution to the primary infringement . . . [, it] must be substantial." *Id.* (quoting *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 155 (S.D.N.Y. 2009)).

The complaint certainly pleads facts supporting a theory of contributory infringement against both Saban and Levy. Both are alleged to have copied *Linda*'s theme song while composing the *X-Men* song, and then, as the owners of Saban Entertainment, distributed it to Marvel. But there is no factual support in the complaint for the conclusion that Chappell or BVT or (or Saban Entertainment itself) knew or had any reason to know of the copyright infringement at issue here. Only one paragraph in the complaint even mentions Chappell's involvement, and it says—in an entirely conclusory sentence—only that: "With knowledge of the infringement, Defendants Chappell, BVT, Saban, Levy, and Wasserman have induced, caused or materially contributed to the infringing conduct of others, such that they should be found to be contributorily liable." SAC ¶ 57. The rest of the complaint mentions Chappell only to either describe Chappell's ownership of the copyright of the *X-Men* theme song, *see* SAC ¶¶ 7, 38, 48, or to note Chappell's "substantial[]" profits from "the stolen work," SAC ¶¶ 49, 58. Similarly, BVT is mentioned in only a few places,

---

[13] Krisko also asserts that Wasserman is secondarily liable for contributory infringement. Because the Court does not have jurisdiction over Wasserman, the Court will not address any of the allegations leveled against him.

and only with respect to its role as a distributor of the *X-Men* television show.  *See* SAC ¶¶ 10, 40, 58.
This is plainly insufficient to plead contributory infringement.

Thus, only Plaintiff's claims for contributory infringement against Saban and Levy survive
the Media Defendants' motion.

### 2.  Vicarious liability

With the exception of Saban and Levy, Krisko has also failed to plead enough facts to
support a claim for vicarious liability against any of the defendants.  "Vicarious liability for copyright
infringement exists where the defendant has the right and ability to supervise the infringing activity
and also has a direct financial interest in such activities."  *ReDigi*, 934 F. Supp. 2d at 660 (internal
quotation and citations omitted); *see Lime Grp.*, 784 F. Supp. 2d at 423, 434–35.  And aside from a
single paragraph in the complaint where Krisko conclusorily states that "Defendants Marvel,
Chappell, Disney, BVT, Saban, and Levy have had the right and ability to control other infringers
and have derived a direct financial benefit from that infringement such that Defendants should be
found to be vicariously liable," SAC ¶ 58, nothing in the complaint adduces any facts that Marvel,
Chappell, Disney, or BVT had any "right" or "ability to supervise" any infringing activity.  The mere
fact that "Saban Entertainment, Chappell, and Marvel have each profited directly from their
licensing of the X-Men theme" does not, despite Plaintiff's assertions to the contrary, "render[]
them vicariously liable for their licensee distributors' infringement."  MTD Opp'n at 23.  Similarly,
the fact that "Marvel and Disney's predecessor, Genesis Entertainment, created and produced the
X-Men show, which contains the X-Men theme" and the fact that "they profited by distributing it to
the other defendants for re-distribution" does not, alone, support a claim for vicarious liability.  *See*
MTD Opp'n at 23.

Still, the complaint contains enough facts to sufficiently plead a vicarious liability claim
against Saban and Levy.  As the owners of Saban Entertainment, and Wasserman's employers, the

Court can infer that both Saban and Levy could supervise both Wasserman's infringing composition and the infringing sale of the *X-Men* theme song to Marvel.

Plaintiff's claims for vicarious liability against Defendants Marvel, Chappell, Disney, and BVT therefore cannot withstand the motion to dismiss.

## IV.    CONCLUSION

For the reasons described above, Wasserman's motion to dismiss is GRANTED, and the Media Defendants' and the Saban Entertainment Defendants' motions are GRANTED in part and DENIED in part.  The remaining defendants in this case are among the best in the world at what they do:  creating and distributing content.  As discovery ensues, plaintiff will explore whether what defendants do is or is not nice.  So, was *X-Men* theme song an original creation, or was it an unlawful copy of the theme song to a TV show that aired in Hungary in the 1980s?  Until next time, fair reader.

The Clerk of Court is directed to remove Ronald Wasserman from the list of defendants in this case and terminate the motions pending at Dkt. Nos. 73 and 76.

SO ORDERED.

Dated:  July 21, 2020

_____
GREGORY H. WOODS
United States District Judge